**Edmund I. SHAMSI, Plaintiff,**

**v.**

**DEAN WITTER REYNOLDS, INC., and Eric Shames, Defendants.**

**Civ. A. No. 88–2617–S.**

United States District Court,
D. Massachusetts.

July 7, 1989.

Memorandum and Order on Plaintiff's Motion for Reconsideration and Defendants' Motion for Judgment on the Pleadings July 16, 1990.

George C. Deptula, Berlin, Clarey, Deptula & Levee, Boston, Mass., for plaintiff.

Gerald Rath, Bingham, Danna & Gould, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SKINNER, District Judge.

The plaintiff Edmund Shamsi alleges that the defendant stock brokers violated federal securities and Massachusetts statutory and common laws by their mismanagement of his account. Defendants' allegedly fraudulent conduct includes making unauthorized investments, selecting unsuitable stocks, deceiving the plaintiff as to the quality of the stocks selected, churning his account, and engaging in unauthorized margin trading. Jurisdiction is premised on the Securities Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and on diversity of citizenship, 28 U.S.C. § 1332(a). Defendants move to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), on the grounds that it fails to state a claim upon which relief can be granted and to adequately particularize the circumstances of the alleged fraud.

The action was filed November 29, 1988. Defendants filed this motion to dismiss February 13, 1989. On March 24, 1989 the plaintiff filed an amended complaint, together with his opposition to the motion to dismiss. In addition to adding diversity as a basis for jurisdiction,[1] the Amended Complaint supplies substantially greater detail of the specific misrepresentations and transactions alleged, and alters the organization of the claims considerably. Although defendants' motion is framed in terms of the original complaint, in this memorandum I will refer to the claims as set out in the Amended Complaint, since this is the plaintiff's current filing.[2]

---

1. In the event they obtained dismissal of the federal claims, defendants sought dismissal of the state law claims for lack of pendent jurisdiction. As there is no dispute that diversity exists this argument for dismissal is no longer relevant.

2. Originally, the complaint spread the securities law claims over the first five counts of the complaint, with state law claims basing the remaining five counts. The amended complaint consolidates the securities law claims in counts I and II, which allege primary violations of Section 10(b) and Rule 10b–5 by both defen-

## FACTUAL ALLEGATIONS

The Amended Complaint alleges the following scenario:

In February of 1987, Shamsi, a Massachusetts resident, was approached by defendant Eric Shames, who solicited Shamsi to invest money under his guidance. Shames, a resident of New York, was employed as a broker/dealer by defendant Dean Witter Reynolds ("DWR"), a New York brokerage house.

Shamsi informed Shames that he had not previously invested in the stock market, but agreed to invest up to $500,000 if he could be assured of investments without risk which would yield a return higher than the bank was giving him. An additional condition Shamsi placed on his decision to open an account with defendants was that he wished to invest for only a 6 week period and needed to be completely out of the market by April 15th, because he needed the funds invested to pay his taxes.

Shames allegedly guaranteed the plaintiff a no risk 10% rate of return on an investment for the period described, and recommended IBM as a suitable stock. Shamsi agreed to invest on this basis, and directed that his funds be invested in conservative blue chip stocks, and IBM in particular. Shames assured him that he could trust the defendants to select low risk stocks which would increase in value.

Before any account opening papers were sent to Shamsi, Shames began to make purchases of stock for the account, in companies of considerably less well established reputations than IBM, i.e., Possis Corporation, Comfed Savings Bank, and Berkeley WR Corporation. In response to the plaintiff's objections and queries as to these purchases, Shames stated that these stocks were "similar to IBM", low risk, consistent with the plaintiff's investment objectives, and that he should "trust [defendants] on this". In reliance on these assurances and representations, Shamsi forwarded the money· for the purchases.

The stock purchases continued through October of 1987 and, like the initial purchases, were not IBM, or any comparable blue chip stock, but shares in considerably less established companies. Shamsi alleges that Shames' representations that the stocks were safe and profitable were intentionally false and misleading, and that these were in fact volatile stocks, with limited earnings and dividend histories. As to one of the stocks defendants' recommended and the plaintiff purchased, Chronar Corporation, Shamsi alleges failure to disclose that DWR was a "Market Maker" in the stock.

In addition to complaining of the quality of the stocks selected, Shamsi alleges that despite his express refusal to authorize margin trading, defendants engaged in such trading, costing him some $8,770 in interest payments to DWR. He further alleges that defendants churned his account to generate excessive commissions. The stock purchases and margin trading occurred from late February to October of 1987. The period of the alleged churning was late February through August of 1987. Shamsi alleges an annual turnover of 4.5 or greater, and commissions paid of $20,446.

In October of 1987, Shamsi authorized Shames to sell off certain of the stocks. The sale was consummated at prices per share lower than those Shames quoted. While the plaintiff does not maintain that he instructed Shames to sell only at the price quoted, he claims that defendants deceived him by failing to disclose the fact that there was a possibility that the price would fall before the sales could be consummated.

Since late October of 1987, there has been no further activity in the account. The plaintiff alleges that the fraudulent scheme continues up to the present date, because of defendants' refusal to close his account, return his assets and nullify the unauthorized margin balance.

dants, and controlling person liability of DWR, respectively. Counts III, IV, V, VI, VIII and IX allege ·breach of fiduciary and contractual duties, fraud, negligence and promissory estoppel. Counts VII and X allege violations of M.G.L. ch. 93A and ch. 110A, § 410.

RULINGS OF LAW

The plaintiff contends that defendants violated federal securities laws and Massachusetts statutory and common laws by engaging in a fraudulent scheme to mismanage his investments, including (1) churning his account, (2) purchasing and selling securities without authorization, (3) engaging in unauthorized margin trading, (4) misrepresenting the riskiness of short term investment in the stock market generally, and of certain stocks in particular, and (5) recommending and selecting stocks for the plaintiff's account without disclosing that DWR was a market maker or held a market position in the stock.

*A. Lack of Particularity.*

The defendants move to dismiss the complaint in its entirety, on the grounds that the allegedly fraudulent activities which are at its heart are described with insufficient particularity to meet the requirements of Fed.R.Civ.P. 9(b).

■ Rule 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." The particularity requirement is strictly construed in this circuit, *see, e.g., New England Data Services, Inc. v. Becher,* 829 F.2d 286, 288 (1st Cir.1987); *Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985); *Wayne Investment, Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 14 (1st Cir.1984). Particularly in actions based on securities law violations, the plaintiff may not delay setting out facts to support his claim pending discovery, but must detail them in the complaint or face dismissal. *See, e.g., New England Data Services, supra,* 829 F.2d at 291; *Wayne Investment, Inc. v. Gulf Oil, supra.*

The purposes behind the particularity requirement are (1) to place defendants on notice and enable them to prepare meaningful defenses to charges of fraud; (2) to prevent the use of conclusory allegations of fraud as a basis for strike suits and fishing expeditions; and (3) to protect defendants from groundless charges which tend to damage their reputations. *See, New England Data Services, Inc., supra,*

829 F.2d at 289; *Hayduk v. Lanna, supra,* 775 F.2d at 443. In evaluating motions to dismiss for lack of particularity, our court of appeals has directed the district courts to be mindful of this purpose to protect defendants from groundless or vague filings, but at the same time to take into account "the policy in favor of allowing amendments and trying the cases on their merits, and against dismissals which would deny plaintiffs their day in court." *New England Data Services, supra,* 829 F.2d at 292.

■ In Rule 10b–5 actions, the complaint must set forth the time, place and content of the misrepresentations which constitute the alleged fraud. As to allegations of unsuitability and churning, the plaintiff must supply details of the trades executed, and facts sufficient to calculate the commission or turnover rate, in order to show that trading was excessive. *See, e.g., Wayne Investment, Inc. v. Gulf Oil, supra,* 739 F.2d 11, 14 (misleading statements in connection with tender offer); *Kempner v. Oppenheimer & Co., Inc.,* 662 F.Supp. 1271, 1282 (S.D.N.Y.1987) (claims of unsuitability, churning and options fraud); *Siegel v. Tucker, Anthony & R.L. Day, Inc.,* 658 F.Supp. 550, 553 (S.D.N.Y. 1987) (churning).

The Amended Complaint and exhibits thereto give specific statements and omissions by defendants which constitute the alleged misrepresentations, and provide breakdowns of stocks purchased and sold, commissions and interest on margin accounts, and facts sufficient to calculate the turnover rates of the stocks in the account. While an annual turnover rate of 4.5 is somewhat low to constitute churning, *see, e.g., Siegel v. Tucker, Anthony, supra,* (holding that annual turnover rate of 2.0 was insufficient, absent special circumstances, and noting that a rate of 6.0 would generally evidence churning), defendants have challenged this claim only on grounds of lack of specificity and not for failure to state a claim.

As the Amended Complaint sets forth the basis for the plaintiff's claims with sufficient particularity to give defendants

notice and enable them to defend against the charges, I find that it satisfies the particularity requirement of Fed.R.Civ.P. 9(b).

### B. Securities Law Claims.

Defendant moves to dismiss certain Counts I and II of the Amended Complaint alleging violations of the securities laws. First, they move to dismiss both claims on the grounds that the misrepresentations alleged are tied only to the plaintiff's decision to open an account, and not to particular decisions to purchase or sell securities. Therefore, defendants argue, the alleged fraudulent conduct was not made "in connection with" a decision to buy or sell securities and is not covered by Rule 10b–5. Alternatively, they move to dismiss the claims insofar as they are based on allegations of misrepresentation and unsuitability, on the grounds that such conduct amounts to mere puffery and unauthorized trading, neither of which are actionable under federal securities laws.

### 1. In connection with purchase or sale.

■ Section 10(b) and Rule 10b–5 make unlawful the use of fraudulent or deceitful conduct in connection with the purchase or sale of a security. See, e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975); Messer v. E.F. Hutton & Co., 833 F.2d 909 (11th Cir.1987). Misrepresentations made solely to induce an investor to open a nondiscretionery account, rather than to make particular stock purchases or sales, are not actionable under Rule 10b–5, because such an account is not a security. See, e.g., Messer v. E.F. Hutton & Co., supra, 833 F.2d 909, 915; Siegel v. Tucker, Anthony, supra, 658 F.Supp. 550, 553.

The account at issue is a nondiscretionary one. While with the exception of stock in Reebok, the stocks purchased were initially selected by defendants, the actual purchases were made by Shamsi. It does not appear that he ever relinquished his exclusive right to make decisions concerning the acquisition and sale of stock, or gave the defendants the discretion to disburse funds. While defendants may have flouted Shamsi's instructions and exceeded their authorization, this does not convert his account into a discretionary one. See, e.g., Messer v. Hutton & Co., supra.

Defendants do not challenge the nondiscretionary nature of the account, but argue that the original complaint was inadequate because it failed to pinpoint specific investment decisions made by the plaintiff, other than his decision to open an account with them. This deficiency is remedied by the Amended Complaint, which alleges specific misrepresentations by defendants as to the prospects of particular stocks selected, and the plaintiff's reliance thereon.

### 2. Unauthorized and Unsuitable Investments.

■ While a broker's executing transactions contrary to a customer's instructions or best interests may constitute breach of contract or fiduciary duty, such conduct is not deceptive within the meaning of Section 10(b) and Rule 10b–5. See, e.g., Pross v. Baird Patrick & Co., Inc., 585 F.Supp. 1456, 1460 (S.D.N.Y.1984) (unauthorized trades absent some deception not actionable under Rule 10b–5); Messer v. E.F. Hutton & Co., supra, 833 F.2d 909, 915 (misrepresentations made solely in connection with opening of the account not actionable); Zerman v. Ball, 735 F.2d 15, 20 (2d Cir.1984) (assertion that broker did not consider investor's financial needs not actionable under securities laws).

Accordingly, the allegations that defendants made unauthorized and unsuitable investments are dismissed as to the federal securities law claims. They will remain in the action, however, as an element of the plaintiff's state law claims.

### 3. Misrepresentations.

■ General representations as to a stock's future performance are not considered deceptive, under Rule 10b–5, since even a naive investor is expected to know of the risks inherent in investing in the stock market. See, e.g., Metzner v. D.H. Blair & Co., 689 F.Supp. 262, 264 (S.D.N. Y.1988) A broker's boasts of his own infal-

libility as an investment advisor are generally not actionable under Rule 10b–5. *See, e.g., Newman v. L.F. Rothschild, Unterberg, Towbin,* 651 F.Supp. 160, 163 (S.D.N.Y.1986), *later proceeding,* 662 F.Supp. 957 (S.D.N.Y.1987). Such hyberbole is considered mere sales hype or puffery, and is not the sort of representation which could deceive a reasonable investor. *See, e.g., Zerman v. Ball, supra,; Metzner v. D.H. Blair & Co., supra.* A broker has no obligation to explain basic aspects of the operation of the market, and his failure to do so is not considered a deceptive omission. *See, e.g., Newman v. L.F. Rothschild, supra,* 651 F.Supp. 160, 164 (that margin accounts contain a certain degree of risk, and that a market decline could precipitate a margin call were such obvious propositions that a broker's failure to explain them could not be the basis for a claim).

■ Shames' optimistic statements about the stock market and particular stocks belong, for the most part, in the category of non actionable puffery. Similarly, the defendants' failure to explain that the price of a stock may fall between the time a sell order is issued and a sale is consummated is a proposition so basic that even an innocent investor is expected to know it. "It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." *Zerman v. Ball, supra,* 735 F.2d 15, 21 (citation omitted).

■ Not all of the statements and omissions the plaintiff identifies, however, are sales hype or common knowledge. Shamsi alleges that defendants explicitly guaranteed him a 10% return on his short term investment. This degree of specificity takes the prediction out of the realm of mere puffery, and into that of an actionable misrepresentation. "The inclusion of a specific percentage ... puts the misrepresentation in a different category from those [boasting of the broker's prowess and likely success]". *Newnam v. L.F. Rothschild, supra,* 662 F.Supp. 957, 959 (broker's guarantee of a no-risk 20–30%

return actionable misrepresentation under Rule 10b–5).

■ In addition, defendants allegedly failed to disclose that DWR was a market maker in one of the stocks selected for the plaintiff's account. A broker's interest in a stock it recommends could well affect an investor's assessment of the recommendation, and the failure to disclose this interest may be a basis for liability.

### C. *Breach of Fiduciary Duty.*

■ Defendants move to dismiss Count III of the Amended Complaint alleging breach of fiduciary duty, on the grounds that the defendants' dealings with the plaintiff could not have created a fiduciary relationship. As a general matter, the existence of a stockbroker-customer relationship does not constitute a fiduciary relationship in Massachusetts. *See, e.g., Lefkowitz v. Smith Barney, Harris Upham & Co.,* 804 F.2d 154, 155 (1st Cir.1986). In *Lefkowitz,* the court held that an investor's longstanding personal friendship with, and reliance on, his account executive, coupled with the investor's lack of business acumen, did not create a fiduciary relationship. The court relied on a decision of the Supreme Judicial Court, *Vogelaar v. H.L. Robbins & Co.,* 348 Mass. 787, 204 N.E.2d 461 (1965), for the proposition that a client's "minimal knowledge of investments and blind reliance on his broker" were insufficient to support a claim of fiduciary duty.

The case for finding a fiduciary relationship in this action is considerably weaker than in either *Lefkowitz* or *Vogelaar.* Shamsi barely knew Shames before agreeing to open an account with him. Far from blindly deferring to the defendants' judgment, the allegations in the complaint demonstrate that Shamsi continually questioned, challenged and opposed their management of his account.

The plaintiff also argues that defendants should be held to standards of a fiduciaries based on their express undertakings in the brokerage agreement. This contention bears on the breach of contract claim, and

does not affect my finding that no fiduciary relationship is imposed by Massachusetts law.

### D. *Chapter 93A Claim.*

██ The defendants move to dismiss Count VII of the Amended Complaint alleging violations of M.G.L. ch. 93A, because the transactions at issue occurred prior to January of 1988, when the statute was amended to embrace securities law claims. Prior to this amendment, ch. 93A did not extend to transactions in securities. *See, e.g., Cabot Corporation v. Baddour,* 394 Mass. 720, 477 N.E.2d 399, 402 (1985) (Ch. 93A would not apply to conduct alleged to violate Section 10(b) and Rule 10b–5); *Levine v. Tucker, Anthony & R.L. Day, Inc.,* 395 Mass. 1004, 479 N.E.2d 694 (1985); *Sweeney v. Keystone Provident Life Insurance Co.,* 578 F.Supp. 31, 35 (D.Mass. 1983) (misleading statements and material omissions in prospectus not the basis of ch. 93A claim); *Conkling v. Moseley, Hallgarten, Estabrook, & Weeden, Inc.,* 575 F.Supp. 760 (D.Mass.1983) (ch. 93A claim unavailable for suit alleging churning and improper investments by stock brokerage house and representative).

The plaintiff argues that the amendment making ch. 93A applicable to securities transactions should be applied retroactively because it is merely procedural in nature, and that in any case, defendants' wrongful conduct extends after the effective date of the amendment because of their continued retention of the plaintiff's assets.

"As a general rule, a statute is applied prospectively unless a contrary intent is clearly manifested by the legislature." *Nickerson v. Matco Tools Corp.,* 813 F.2d 529, 532 (1st Cir.1987); *see, e.g., Goldstein Oil Co. v. C.K. Smith Co., Inc.,* 20 Mass. App. 243, 479 N.E.2d 728, 732 (1985) *review denied,* 395 Mass. 1104, 482 N.E.2d 328 (1985); *Smith v. Caggiano,* 12 Mass.App. 41, 421 N.E.2d 473, 475 (1981), *appeal denied,* 440 N.E.2d 1172 (Mass.1981) (1979 amendment eliminating loss of money or property as an element of a ch. 93A claim only applied prospectively). An exception is made for amendments which are procedural, and do not create new substantive rights and liabilities. *See, e.g., Commonwealth v. Bargeron,* 402 Mass. 589, 524 N.E.2d 829 (1988) (amendment extending the statute of limitations for assault applied retroactively). Amendments extending the reach of ch. 93A, even when the targeted conduct would be actionable under other laws, are substantive, since they subject defendants to the statute's "more exacting business standards" and work a change in the established expectations of the parties which is "entirely substantive." *Goldstein, supra,* 479 N.E.2d at 732 (amendment repealing interstate commerce exemption for ch. 93A not applied retroactively). The 1988 amendment did not merely expand the remedies available under ch. 93A, or the time period within which suit may be brought, but extended its reach to entirely new causes of action. Therefore, the amendment is substantive and, in the absence of an express legislative direction to the contrary, I will not apply it retroactively. *See, e.g., Goldstein Oil v. Smith, supra; Smith v. Caggiano, supra;* compare, *Nickerson v. Matco Tools, supra.*

The plaintiff alleges that defendants' wrongdoing continues up to the present time, by virtue of their continued retention of his assets and refusal to forgive the interest incurred on his margin trades.

The margin trading and resultant accrual of interest charges occurred prior to the amendment. These are the relevant transactions for purposes of ascertaining the time of the offense, and defendants ongoing refusal to wipe out these interest charges does not create a new and later source of liability.

The allegations of retention of the plaintiff's assets, however, may make out a current claim and to the extent that the plaintiff's injuries are attributable to conduct which occurred after January 5, 1988, the effective date of the amendment, his ch. 93A claim will remain in the action.

Accordingly, the motion to dismiss is ALLOWED as to Count III; ALLOWED as to Count I, except as to allegations that defendants made misrepresentations that guaranteed the plaintiff a specific percent-

age return on his investment and that they failed to disclose DWR's interest in stock of Chronar; and ALLOWED as to Count I, except insofar as the conduct alleged occurred after January 5, 1988. The motion is DENIED in all other respects.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION AND DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

The plaintiff is suing his stockbrokers for fraud and mismanagement of his account. After the defendants filed a motion to dismiss, the plaintiff amended his complaint. The allegations are summarized in my Memorandum and Order dated July 7, 1989. After considering the defendants' motion to dismiss in relation to the amended complaint, I allowed it in part. The plaintiff has filed a motion for reconsideration or clarification of my July 7 order. The defendants have filed a motion for judgment on the pleadings with respect to most of the remaining counts of the amended complaint.

### Plaintiff's Motion for Reconsideration

The plaintiff contends: (1) that my July 7 order excludes "churning" as a basis of relief, although the text of my memorandum indicates that churning was alleged with sufficient particularity and the defendants did not move to dismiss the churning count for failure to state a claim; (2) that I improperly rejected the plaintiff's "unsuitability" theory, confusing it with the claim for "unauthorized trading;" (3) that I unduly restricted the allegations of misrepresentation upon which liability for securities fraud may be based. I find that the plaintiff is entitled to clarification on point (1), but that his other arguments attempt to reopen issues that I decided adversely to him after thorough consideration.

I ruled that the amended complaint alleged churning with sufficient particularity under Fed.R.Civ.P. 9(b). I noted in my July 7 memorandum that the "defendants have challenged this claim only on grounds of lack of specificity and not failure to state a claim." The order should have indicated that the churning theory remained as a possible basis of recovery under count I of the amended complaint.

There is some confusion about the plaintiff's allegations that the defendants fraudulently recommended unsuitable investments. The plaintiff had originally included these in his claim for securities fraud based on misrepresentations and material omissions (count I of the complaint). The unsuitability theory was also stated separately, in count III. The defendants moved to dismiss count I, but not count III, for failure to state a claim. The plaintiff consolidated all of his federal securities fraud theories in count I of the amended complaint. Although the defendants did not expressly move to dismiss count III of the original complaint, by challenging all of the underlying allegations of fraud they fairly put the unsuitability claim in issue. For without fraudulent misrepresentation, count III of the complaint does not state a claim. This seems to have been recognized by the plaintiff when he merged his theories in count I of the amended complaint. My July 7 decision properly extended to all aspects of count I that depend on misrepresentation.

The plaintiff suggests that I did not fully appreciate his unsuitability claim when ruling on the defendants' motion to dismiss. This is not so. I "subsumed" the theory under my discussion of unauthorized trading to indicate that recommending unsuitable investments is not actionable under federal law absent allegations of fraud. *Zerman v. Ball*, 735 F.2d 15 (2d Cir.1984). I then addressed the particular misrepresentations alleged in the amended complaint. I ruled that except for two misrepresentations, the allegations concerned non-actionable sales hype and puffery. The ruling covers the allegations of deception upon which the unsuitability theory is based.

The plaintiff now asks me to change my mind and rule that all of the defendants' remarks, including sales talk, market prognostication and other nonfactual statements, are actionable elements of the defendants' scheme to defraud. I took full account of the plaintiff's argument before

reaching my decision on the motion to dismiss, and I see no reason to rule differently now.[1]

Accordingly, the plaintiff's motion for reconsideration is denied.

*Defendants' Motion for Judgment on the Pleadings*

The defendants now seek to apply my rulings on their dismissal motion to narrow the issues further. First, they argue that my determination that the plaintiff's account was nondiscretionary means that the defendants did not "control" the account and cannot be held liable for churning. The defendants misapprehend the degree of control required in a churning case. As shown by *Tiernan v. Blyth, Eastman, Dillan & Co.*, 719 F.2d 1, 3 (1st Cir.1983), several considerations must be taken in deciding who controls the level of trading in an account. *Tiernan* implies that where an inexperienced investor routinely follows the advice of his broker, the latter may be liable for churning notwithstanding that the client authorizes each transaction. Control is a question of fact best resolved by the jury.

The defendants argue that there was insufficient turnover in the account to indicate churning. Based on the schedule in the amended complaint, the transactions in the plaintiff's account may be summarized as follows. In March and April 1987, $811,212.50 worth of various stocks (Berkley W.R. Corp., Comfed Savings Bank, Possis Corp., Patten Corp., Hogan Systems, Inc., Lotus Development Corp., Tracor Corp., Ethyl Corp., and Cetus CP Comm.) were purchased and nothing was sold. On May 1, $213,125 worth of stock in Reebok was bought at the plaintiff's suggestion. On May 4, the Lotus Development stock was sold for $137,500 to help pay for the Reebok. The plaintiff chose to sell Lotus Development and realized a profit on the transaction. The Reebok was sold on May 14 for $215,000, nearly breaking even after brokerage charges. On May 29, the Hogan Systems stock, purchased for $163,062.50, was sold for $155,000. In late June, $122,500 worth of Chronar Corporation stock was purchased. In late August and early September, the Patten, Ethyl and Tracor stock was sold for $306,250. An additional $32,500 worth of Possis stock was bought to "average out" the plaintiff's purchase price. On October 27, the Berkley W.R., Comfed Savings, Possis and Cetus holdings were liquidated for $137,275. The following day $69,000 was invested, at last, in "suitable" stocks (WalMart, AMEX and ATT). On November 5, additional Chronar stock was bought for $47,500. As of March 20, 1989, the account still held the latter four stocks. They had been purchased for a total of $239,000 and were then worth $198,571.

Except for the Reebok/Lotus transaction, which the plaintiff initiated, from March 5 until August 28 over $933,000 worth of stock was purchased for the account and only Hogan Systems (purchased at $163,000) was sold. Most of these stocks had declined in value. A large part of the portfolio (Patten, Ethyl and Tracor) was then liquidated, with only a small offsetting purchase. (The remainder of the proceeds presumably went toward broker's fees and margin debt or else was paid to the plaintiff.) After the October crash, another large part of the account was liquidated and partially reinvested in safer securities. (More Chronar was also bought.) The pattern is one of accumulation of stock, to some extent on margin, followed by a collapse in prices and the selling off of a devalued portfolio. What is missing is the repeated sale of stock to finance new acquisitions, the usual sign of churning. Taking losses after an account has been imprudently leveraged is not the same thing. Unless the defendants had set out to recommend junk knowing that it would soon have to be sold, the level of turnover in the plaintiff's account is too low to establish a claim for churning. The complaint does not allege that sinister a plot.

---

1. The plaintiff should note that in deciding that particular representations are not actionable, I have not made an evidentiary ruling. Standards of relevance will determine what proof is allowed.

The churning claim shall be dismissed under Fed.R.Civ.P. 12(c).

The defendants seek to apply my rulings on count I of the amended complaint to the control person claim asserted in count II. Since control person liability is derivative, I shall allow this part of the defendants' motion. Similarly, the defendants would have me limit the plaintiff's blue sky claim to the same extent as his federal securities law claims. Since the plaintiff has not opposed this request, it shall be granted.

The defendants ask that the claims for common law fraud and negligent misrepresentation be dismissed to the extent that they are based on sales puffery, in conformance with my ruling on count I. The plaintiff has argued plausibly that some of the defendants' statements are actionable misrepresentations under Massachusetts law even though they did not violate federal securities law. The defendants have cited no authority holding that the state and federal causes of action are identical in this respect, so the law of the case does not resolve the state law misrepresentation issues.

The defendants also seek dismissal of the plaintiff's state law claim for negligence in recommending unsuitable investments, relying on my rulings on the federal unsuitability claim. Since negligence does not require fraud, this reliance is misplaced.

In my July 7 Memorandum and Order, I ruled that the plaintiff's claim under Mass. Gen.L. ch. 93A was limited to conduct that occurred after the effective date of an amendment extending Chapter 93A to securities transactions. I misstated the effective date of that amendment as January 5, 1988. As the defendants have noted, the amendment became effective on April 4, 1988. In accordance with my ruling on retroactivity, the plaintiff's Chapter 93A claim would be limited to the defendant's conduct on or after April 4, 1988, namely, their continued retention of margin stock.

The plaintiff alleges that it was unfair of the defendants to retain his stock because he never signed an agreement authorizing the purchase of stock on margin, as is allegedly required by SEC Regulation T.

The defendants assert that Massachusetts law permits them to retain margin stock notwithstanding the absence of a written agreement.

That the margin account may have been established in violation of Regulation T does mean that the plaintiff is entitled to the margin stock. The amended complaint fails to specify when the margin debt was incurred or in connection with which securities. If the debt can be traced entirely to securities currently held in his account (which seems unlikely), then the plaintiff has no right to possession since he does not own the stock. On the other hand, to the extent the debt resulted from earlier purchases, it appears that the plaintiff ratified the margin transactions by selling those securities and benefitting from the proceeds. If, for example, the Lotus stock was bought on margin, the subsequent transactions in Lotus and Reebok would demonstrate that despite his occasional protests the plaintiff stood ready to benefit from leveraged gains in his account. Since the sketchy allegations of the amended complaint suggest that the defendants can argue in good faith that the plaintiff condoned the margin transactions, retention of the margin stock does not constitute an unfair trade practice. I need not rule on the applicability of Regulation T. The Chapter 93A claim shall be dismissed under Fed.R.Civ.P. 9(b) and 12(c).

Accordingly, the claim for churning under count I of the amended complaint is dismissed. Counts II and X are dismissed to the same extent as count I. Count VII is dismissed in its entirety. In all other respects, the defendants' motion for judgment on the pleadings is denied. The clerk shall set a date for a scheduling conference.